IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

TYRONE L. WARE,
      Petitioner,

vs.                                    Case No.:  3:05cv440/LAC/EMT

WALTER A. McNEIL,[1]
      Respondent.
_____/

## ORDER/REPORT AND RECOMMENDATION

      This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (Doc. 1).  Respondent filed a response and relevant portions of the state court record (Doc. 11).  Petitioner filed a reply (Doc. 15).

      The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(b).  After a careful review of the state court record and consideration of all issues raised by Petitioner, it is the opinion of the undersigned that an evidentiary hearing is not required for disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I.      BACKGROUND

      Following a jury trial in Escambia County, Florida, Petitioner was found guilty of second degree murder with a weapon, a lesser included offense (Doc. 1 at 1, Doc. 11, Ex. A at 44).  On February 26, 1999, Petitioner was sentenced to a term of natural life in prison, with pre-sentence jail credit of one year and 170 days (Doc. 1 at 1, Doc. 11, Ex. A at 67–71).  Petitioner directly appealed

---

[1]Walter A. McNeil succeeded James R. McDonough as Secretary for the Department of Corrections, and is automatically substituted as Respondent.  *See* Fed. R. Civ. P. 25(d)(1).

his conviction and sentence to the Florida First District Court of Appeal ("First DCA"). The appellate court affirmed the conviction and sentence per curiam without written opinion on September 19, 2001, with the mandate issuing October 5, 2001 (Doc. 11, Ex. J). Ware v. State, 795 So. 2d 65 (Fla. 1st DCA Sept. 19, 2001) (Table). Petitioner did not seek certiorari review by the Florida Supreme Court or the United States Supreme Court.

On July 31, 2002, Petitioner filed a pro se motion for postconviction relief under Rule 3.850 of the Florida Rules of Criminal Procedure (id., Exs. K at 73–145). The trial court held two evidentiary hearings on July 2, 2003, and November 20, 2003, respectively (id., Ex. L at 222–334). Petitioner was represented by counsel at both evidentiary hearings. After the hearings, the parties submitted written arguments (id., Ex. L at 345–64). The trial court denied the 3.850 motion by written order (id. at 365–67). Petitioner appealed the decision to the First DCA, and the appellate court affirmed per curiam without written opinion on August 25, 2005, with the mandate issuing September 12, 2005 (id., Ex. J). Ware v. State, 910 So. 2d 264 (Fla. 1st DCA 2005) (Table).

Petitioner filed the instant petition on November 17, 2005 (Doc. 1 at 6). Respondent concedes the petition is timely and that Petitioner has exhausted state remedies with regard to claims one through seven (Doc. 11 at 2).

## II.   TRIAL EVIDENCE

Resolution of Petitioner's claims requires thorough consideration of the evidence adduced at trial. Therefore, a summary of this evidence follows.

The State called several witnesses to testify. Officer Dewise testified that on September 9, 1997, at approximately 9:00 a.m., he was dispatched to 1215 North C Street, Pensacola, Florida (Doc. 11, Ex. B at 97). Petitioner approached Officer Dewise and explained that he had gotten into a "simple fight" with a black female who left the area and that there was no need for the police department to be there (id. at 98). Petitioner indicated that the female had been walking south on C Street while Petitioner was sitting on his front porch (id. at 99). Petitioner stated that the female was angry and had attacked him (id.). Petitioner told Officer Dewise that he hit her a couple of times, and she ran off south on C Street (id.). Officer Dewise observed blood on Petitioner's shorts (id.). Petitioner stated that the blood was from some of the scratches he sustained in the fight with the female (id.). Petitioner showed Officer Dewise cuts and scratches on his body that corresponded

with the blood on Petitioner's shorts (*id.* at 107).  Officer Dewise contacted his Sergeant, Officer Stull, and when he arrived they entered the home on C Street through the rear door (*id.* at 103–04).  They observed a black female lying face down in the bathroom (*id.* at 103).  She was dead (*id.* at 104).  There were no weapons near her body (*id.* at 105).  Officers Dewise and Stull exited the home and made contact with Petitioner (*id.*).  They placed Petitioner in custody and secured the crime scene (*id.*).  Petitioner stated that the home belonged to his grandmother (*id.* at 106).  At booking, Petitioner indicated that his home address was 2605 Thomlinson Road, Pensacola, Florida (*id.*).  Petitioner's height was six feet, one inches, and he weighed 165 pounds on the date of his arrest (*id.*).

    James Brooks testified that although he was currently employed at the North American Art Company, he was employed as a patrol officer with PPD on the date of the incident (*id.* at 111).  While police were investigating in the area, Petitioner told Mr. Brooks that he had gotten into a fight with a young lady and was concerned that she was hurt (*id.* at 112).  Petitioner stated that the fight occurred in the side and back yard by the carport (*id.* at 113).  Mr. Brooks transported Petitioner to the Pensacola Police Department (*id.*).  While Petitioner was in custody in the back of the police cruiser, Petitioner stated, "I'm in a world of trouble Brooks" (*id.* at 112–13).

    Officer Lee Jennings, a crime scene investigator with PPD, testified that he had been employed with PPD for twelve-and-a-half years and that he was employed in that position when the incident occurred (*id.* at 116–17).  He arrived at the crime scene at 10:55 a.m. and was briefed by the other officers outside of the residence (*id.* at 117).  After the briefing, Officer Jennings entered the home and observed the decedent lying on the floor in the bathroom (*id.*).  She was nude and partially covered with a sheet (*id.* at 127).  He took photographs of the interior of the home (*id.* at 118).  He also took photographs of a couch located in the living room (*id.*).  He photographed areas of blood on the carpet (*id.* at 120).  Officer Jennings lifted two latent fingerprints from a telephone located in the living room on a coffee table (*id.* at 121).  He also observed blood on the telephone (*id.*).  He sent the latent prints to a latent print examiner for fingerprint comparisons (*id.* at 123).  He took blood samples from the phone and sent them to the Florida Department of Law Enforcement ("FDLE") for serology exams (*id.*).  Officer Jennings also seized some of the carpet from the dining room and the entire living room carpet for examination (*id.* at 123–24).  Officer Jennings collected

a blood-stained pillow from the scene (*id.* at 128). He also recovered a large serrated knife that had a broken tip, a black handled knife with a vent blade, and a meat fork from the kitchen (*id.* at 128–29). He collected a flower-printed sheet that was used to cover the decedent's head and a pair of yellow latex kitchen gloves (*id.* at 130). Officer Jennings observed blood stains on the living room carpet directly by the couch (*id.*). There were also blood stains on the pillow (*id.*). There were drag marks in blood from the kitchen door to the carpeted area of the bathroom (*id.* at 132–33). A large blood stain was in the doorway between the dining room and kitchen (*id.* at 133). A large area of cleaned up blood was found around the back door of the kitchen area (*id.*). Officer Jennings did not find any weapons on or about the immediate vicinity of the victim's body (*id.* at 135).

Officer James Richbourg, a latent fingerprint technician with PPD, testified that he was called to the scene to assist with a homicide investigation at 1215 North C Street in Pensacola, Florida (*id.* at 142, 144). He observed and rendered assistance in measuring and collecting the evidence (*id.*). Officer Richbourg took photographs of Petitioner on the day of the investigation (*id.* at 145). The photographs depicted minor scratches and abrasions to Petitioner's chest and abdomen (*id.* at 146). Officer Richbourg observed minor scratches and abrasions to the left side of Petitioner's chest and left abdomen area, and one on Petitioner's left bicep (*id.*). Officer Richbourg did not observe any other wounds on Petitioner (*id.* at 147). Officer Richbourg seized the clothing that Petitioner was wearing on September 9, 1997, when he was arrested (*id.* at 148). He sent Petitioner's clothing to FDLE for examination (*id.* at 148–49). Officer Richbourg also seized the knives and forks he found at the crime scene and logged them into evidence (*id.* at 149–50). A 1996 Chevrolet, tag number TKF72U, was also seized during the investigation of the crime scene (*id.* at 161). A white plastic bag was found inside the trunk of the car (*id.* at 162). The bag contained a pair of burgundy dress shorts with a black belt, a purple L.A. Lakers tee shirt, a pair of panties and a bra (*id.*). Officer Richbourg assisted Officer Jennings in lifting and processing the latent fingerprints (*id.* at 163). Petitioner's left palm print was lifted from the bathroom floor (*id.* at 164). The palm print was found next to the mid-chest area of the victim on the left side of her body (*id.*). Officer Richbourg lifted a right middle finger print from the victim from the dining room door facing the kitchen (*id.* at 164–65). Petitioner's left palm print was found on the left side, center, and rear of the Chevrolet's trunk (*id.* at 165–66). Petitioner's right ring fingerprint was found on the

telephone from the residence (*id*. at 167).  Petitioner's right index finger was found on the coffee

table in the living room (*id*. at 168).  Officer Richbourg testified that he did not observe any cuts,

scratches, or abrasions on Petitioner's legs (*id*.).  Officer Richbourg testified that he observed blood

stains on the inside and bottom left leg of Petitioner's shorts (*id*. at 171).  Petitioner's shorts were

sent to FDLE for DNA testing (*id*.).

Charles Richards, FDLE senior crime lab analyst in the latent print section, testified that he

processed three knives and a meat fork for latent prints (*id.*, Ex. C at 177, 179).  He developed latent

prints from a brown-handled knife but could not develop prints from any of the other items (*id*. at

179–80).  Mr. Richards concluded that the prints found on the knife were Petitioner's (*id*. at

180–81).

Janice M. Johnson, an FDLE crime scene analyst and bloodstain pattern interpreter, testified

that she and Jack Remus, a forensic serologist trainee, went to the crime scene in the early evening

of September 9, 1997 (*id*. at 191, 192–93).  The victim's body had been removed from the residence

prior to their arrival (*id*. at 193).  Initially, she conducted a visual exam and took crime scene

photographs (*id*.).  She also assisted PPD in determining which items to cut, swab, and collect from

the scene (*id*.).  She examined a couch on November 7, 1997, that had been removed from the

residence (*id*.).  She examined the sofa and the carpet for bloodstain patterns (*id*. at 194).  The blood

stains were circular in shape and consistent with someone bleeding and dropping blood (*id*.).  The

blood on the sofa cushions was further analyzed for DNA (*id*.).  Ms. Johnson testified that the blood

on the sofa was medium velocity blood spatter, the type usually associated with a beating or stabbing

(*id*. at 195–96).  Based on her analysis, Ms. Johnson determined that the victim shed the blood when

she was near the floor (*id*. at 197).  She was unable to determine, based on her review of the blood

stains, whether the victim was stabbed or beaten (*id*. at 198).  She determined that the blood on the

carpet indicated that the victim was injured and dripping blood (*id*.).  She also discovered medium

velocity blood spatter on the wall adjacent to the right arm of the sofa (*id*. at 199).  She observed

nondescript contact stains on the wall consistent with a bloody body part touching a non-bloody

surface (*id*. at 200).  She also observed drag marks in the blood leading from the sofa area through

the dining room into the bathroom (*id*.).  She observed nondescript smear stains all over various

surfaces in the bathroom (*id*.).  As a blood spatter expert, she concluded that an individual with

blood on them touched all of the surfaces and left nondescript stains in the bathroom (*id.*).  She also determined a body was dragged through the residence (*id.* at 201).  She concluded that the most forceful bloodshed occurred in the sofa area, continuing to the wall area (*id.*).  She additionally concluded that the victim may have collapsed and then was dragged through the living room area to the bathroom (*id.* at 201–02).  She opined that continuous drag marks are indicative of someone dragging another body, while drag marks that stop and start are consistent with an individual dragging herself (*id.* at 203).  She testified that the blood drops on the carpet may have been consistent with someone standing up and dripping the blood on the carpet (*id.* at 203–04).  The pattern of blood in front of the sofa could have been consistent with two people engaged in a struggle (*id.* at 204).  The most forceful point of impact in the struggle was on the sofa (*id.*).  Ms. Johnson was unable to determine from the evidence that she examined whether the victim stabbed Petitioner first (*id.*).  She also was unable to determine, based upon her observation of the crime scene, the chronological sequence of the blood stains (*id.* at 204–05).  Ms. Johnson testified that the contact blood stain on the wall was consistent with someone who had blood on them struggling and being pushed against the wall (*id.* at 206).

Officer Hughes testified that Thomas Ware, Petitioner's father, made the original 911 call (*id.* at 217).  Officer Hughes responded to the crime scene at 1215 North C Street on September 9, 1997 (*id.*).  Petitioner's grandmother owns the home at 1215 North C Street but lives out of the area (*id.*).  Officer Hughes arrived at the crime scene at 10:30 a.m. (*id.*).  Officer Hughes directed that the 1996 Chevrolet be taken to PPD for processing (*id.*).  Petitioner was not at the scene when Officer Hughes arrived (*id.*).  Officer Hughes left the scene and went to PPD to interview Petitioner (*id.* at 219–20).  Officer Hughes identified Petitioner in the courtroom as being the person he interviewed at PPD (*id.*).  Before taking Petitioner's statement, Officer Hughes advised him of his <u>Miranda</u>[2] rights (*id.* at 220)  Petitioner indicated that he understood his rights (*id.* at 222).  He also signed a waiver of rights form (*id.*).  Officer Hughes testified that Petitioner's demeanor was quiet, calm, and reserved when he signed the form (*id.*).  He did not appear to be under the influence of drugs, alcohol, or medication when he signed the form (*id.*).  Officer Hughes did not make any

---

[2]<u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

threats or offers of leniency in order to induce Petitioner to sign the waiver of rights form (*id.* at 223).  Officer Hughes witnessed Petitioner sign the form (*id.*).  Officer Hughes testified that Petitioner stated that at approximately 4:30 a.m. he and the victim were in the house doing drugs and "things they shouldn't be doing" (*id.* at 224).  Petitioner stated that the girl wanted $10.00 and he was not going to give her any money (*id.*).  Petitioner told Officer Hughes that the girl pulled a knife on him, and he had to protect himself (*id.*).  Petitioner told Officer Hughes that he and the victim were fighting over money and drugs (*id.* at 230–31).

The final State witness to testify was Dr. Gary Dean Cumberland, medical examiner for the First District of Florida (*id.* at 239).  Dr. Cumberland testified, after examining photographs of Petitioner, that there were no bite marks or stab wounds on Petitioner (*id.* at 243).  Dr. Cumberland testified that Petitioner's injuries were consistent with fingernail scratches and scrapes of the skin's surface (*id.*).  He performed the autopsy of the victim on September 10, 1997 (*id.* at 243–44).  The victim weighed 130 pounds and was 45 years old at the time of the autopsy (*id.* at 244–45).  She had alcohol, cocaine, and the anti-depressant, amitriptyline, in her system at the time of death (*id.* at 245–46).  The victim had multiple injuries to the head and face (*id.* at 247).  Both of her eyes were black with bruising and soft tissue damage (*id.* at 247–48).  She had scrapes and abrasions on her temples and left cheek (*id.* at 248).  Her lips and mouth were torn and bruised (*id.*).  Dr. Cumberland opined that the injuries to her face and mouth were consistent with someone hitting her with a fist (*id.*).  She also had two incisions on her neck consistent with an object with a sharp blade such as a knife or razor (*id.* at 250).  She also had stab wounds on her back consistent with someone being stabbed with a barbeque fork commonly used on a grill (*id.* at 265).  She also had stab wounds on her chest (*id.* at 266).  When Dr. Cumberland arrived at the crime scene, the victim was still lying on the bathroom floor (*id.*).  Dr. Cumberland opined that the hyoid bone in her neck was fractured, consistent with strangulation (*id.* at 267–68).  All of the wounds on her extremities were consistent with defensive wounds (*id.* at 274).  He also testified that all of the victim's wounds were inflicted at the same time, that is, within hours of each other (*id.* at 276).  Dr. Cumberland opined that the victim's death was a homicide and that the cause of death was the result of compression of the neck as well as multiple stab wounds in the neck, chest, back, and abdomen (*id.* at 276–77).

On cross-examination, Dr. Cumberland testified that he never examined Petitioner (*id.* at 279).  He testified that the bruising and abrasions on the victim's lips and face were consistent with the type of injuries sustained by two children fighting on a playground (*id.* at 280).  Dr. Cumberland did not compare any weapons to the victim's wounds (*id.*).  Dr. Cumberland opined that the amount of force used to inflict the injuries upon the victim was consistent with someone in a rage, heat of passion, or fighting for his life (*id.* at 281).  Dr. Cumberland could not testify as to the type of knife that caused the victim's death or to the time of death (*id.* at 282).

The prosecution rested (*id.* at 334).  Petitioner's counsel moved for a judgment of acquittal ("JOA") (*id.*).  Petitioner's trial counsel argued that, looking at the facts in the light most favorable to the State, the State had shown that Petitioner committed an unlawful killing (*id.*).  He argued that the evidence, however, was insufficient to support premeditation because there was no evidence to prove whether the death was the result of stabbing or strangulation (*id.* at 334–35).  Petitioner's counsel argued that the unlawful killing was commensurate with a manslaughter charge (*id.* at 335).  Petitioner's counsel argued further that the State failed to exclude every reasonable hypothesis of innocence proffered by Petitioner (*id.* at 336).  He argued that Petitioner was defending himself from a lady attacking him with a knife (*id.*).

In opposition to Petitioner's motion for judgment of acquittal, the State argued that it presented evidence that the victim sustained defensive wounds thereby substantiating premeditation (*id.* at 338).  Next, the State argued that, prior to the victim's death, the victim and Petitioner were arguing over money (*id.* at 339).  The State also argued that there was circumstantial evidence showing that Petitioner went into the kitchen to obtain one or more of the weapons that he used on the victim and walked back into the living room (*id.* at 340).  The State asserted that premeditation may be inferred based on the types of weapons used, and that the types of weapons used in this case were deadly weapons  —  butcher knives and a thick, steel, barbeque fork (*id.* at 341).  The State argued that premeditation could be inferred due to the extreme violence and the nature and manner of the wounds, particularly the numerous wounds to the victim's back (*id.* at 341–42).

Upon further argument in support of his motion for judgment of acquittal, Petitioner argued that Dr. Cumberland testified that the victim's wounds were consistent with the types of injuries

inflicted by someone in a rage or heat of passion, which is indicative of a second-degree murder charge (*id.* at 343).

The trial court determined that the State made a prima facie showing of guilt, and the motion for judgment of acquittal was denied (*id.* at 344). Prior to Petitioner presenting any evidence, the State argued a motion in limine to preclude Petitioner from presenting evidence that he contracted AIDS after his contact with the victim and evidence that the victim, in fact, had the AIDS virus at the time of the altercation (*id.* at 347–48; *see also id.*, Ex. B at 23–36 ). Petitioner's counsel assured the court and the State that he had reviewed the court's ruling on the presentation of evidence relating to AIDS, and that Petitioner understood that he could relate the victim's statement that she had AIDS, but he could not mention whether the statement was truthful or whether he contracted AIDS after his encounter with her (*id.*).

The defense called Petitioner to testify (*id.*, Ex. C at 349). Petitioner testified that he was 35 years old, lived at 2605 Tomlinson Road, and worked in lawn maintenance at Carriage Hills golf course (*id.* at 350). Petitioner had one felony conviction on his record (*id.*). He stated that did not know the victim prior to September 8, 1997 (*id.* at 351).[3] Petitioner took the victim to his grandmother's house on C Street to smoke crack cocaine and drink beer (*id.*). At approximately 11:30 p.m. on September 8, 1997, Petitioner exchanged crack for sex with the victim (*id.* at 352). It was getting late, and Petitioner had to be at work at 6:15 a.m., so he asked the victim to put on her clothes and leave (*id.*). The victim refused to leave because she wanted to smoke more crack (*id.*). Petitioner testified that the victim went into the kitchen, grabbed a knife, and attacked him in the living room (*id.* at 354–55). Petitioner testified that she wanted him to either give her more crack or money (*id.*). Petitioner refused to comply and told the victim that the high was over and that he was ready to leave (*id.* at 354). The victim was distraught and put the knife near Petitioner's chest in an attempt to stab him (*id.*). Petitioner grabbed the knife and tried to restrain the victim (*id.*). A struggle ensued (*id.*). Petitioner stated that he weighed 148 pounds when he was arrested (*id.*). Petitioner testified that the victim told Petitioner that he was going to die because she had AIDS, and she had given him the disease when they had sex (*id.* at 355). Petitioner stated that he "lost his

---

[3]Although the crime occurred on September 9, 1997, Petitioner met the victim in the late evening hours of September 8, 1997 (Doc. 11, Ex. C at 350–51).

head" and was in a rage (*id.* at 355, 377).  Petitioner testified that he stabbed the victim, but did not
recall how many times he stabbed her (*id.*).  Petitioner testified that the struggle lasted for a few
seconds (*id.*).  Petitioner called his sister, and she went to the residence to talk to him (*id.*).
Petitioner was scared and angry (*id.*).  Petitioner did not know whether the victim was dead when
he called his sister (*id.* at 358).  Petitioner testified that he put on latex gloves after he stabbed the
victim so that he would not contract a disease (*id.*).  Petitioner placed the victim in the bathtub
before his sister arrived so that the police would not detect fingerprints on her body (*id.* at 359).
Petitioner testified that he was not thinking clearly that night (*id.*).  Petitioner told Officer Brooks
that he was in a world of trouble because he was at his grandmother's house, doing things he should
not be doing (*id.* at 360).  Petitioner knew that once he was put into a police car, he would not see
freedom again for a long time (*id.*).  Petitioner testified that he never intended to kill the victim (*id.*).
Petitioner told Officer Hughes that the victim approached him with a knife, and he had to protect
himself (*id.* at 361).  Petitioner knew that the victim was a prostitute (*id.*).  Petitioner testified that
he was high on drugs and alcohol; therefore, he was not in a proper state of mind (*id.* at 362).
Petitioner was scared that the victim could infect him with AIDS by biting, scratching, or kicking
him (*id.*).  Petitioner stated that he was fighting for his life and defending himself when he killed the
victim (*id.*).  Petitioner testified that he was sorry the victim was dead (*id.* at 362–63).

On cross-examination, Petitioner testified as follows.  Petitioner had stab wounds in his chest
from the victim stabbing him (*id.*, Ex. D at 367– 68).  The victim cut Petitioner on the back side of
his right forearm (*id.* at 368).  Petitioner testified that he beat the victim in the face when the fight
initially ensued (*id.* at 394).  Petitioner did not recall choking the victim (*id.*).  Petitioner grabbed
the knife by the blade to get it out of the victim's hand (*id.* at 371).  Petitioner ran into the kitchen
and the victim followed him (*id.* at 372).  A fight ensued from the kitchen to the living room (*id.*).
When the victim tried to bite Petitioner in the leg, he stabbed her in the back with a knife a few times
(*id.* at 372–73).  Petitioner sustained wounds from the victim biting him on the left leg (*id.* at 373).
Petitioner stabbed the victim three times in the back with the knife in front of the sofa in the living
room (*id.* at 374).  The pillows fell off the couch after the fight ensued (*id.*).  After Petitioner stabbed
the victim, she kept fighting and attempting to harm him (*id.* at 376).  Petitioner ran into the kitchen
and grabbed a barbeque fork to defend himself (*id.* at 378).  The victim followed Petitioner to the

kitchen trying to strike Petitioner (*id.* at 379).  Next, as Petitioner as was attempting to get the knife out of the victim's hands, he stabbed her with the fork numerous times (*id.* at 380).  Petitioner and the victim were fighting in the bathroom, and she was still trying to stab him (*id.* at 382).  Petitioner slashed the victim's throat with a knife after they fought in the bathroom, and when they were fighting in the bathroom, the victim collapsed in the bathtub and died (*id.* at 382–84).  Petitioner testified that his memory was "pretty good" regarding what happened on the night of the incident (*id.* at 395).  Petitioner did not attempt to clean up the crime scene, and his sister, Tiffany, did not help him clean up the crime scene (*id.* at 396).  Petitioner put the victim's clothes in a white plastic bag in the trunk of the car (*id.*).  The bag had the victim's blood on it (*id.*).  Petitioner put the knives and fork back in the sink (*id.* at 398).  Petitioner washed the blood off of the knives (*id.*).  Petitioner put a sheet over the victim's body to prevent blood from getting on the floor (*id.*).  The victim was lying on the bathroom floor when the police arrived (*id.* at 399).  Petitioner never restrained or tied up the victim in order to inflict injury upon her (*id.* at 400).  Petitioner tried to wash his fingerprints off of the victim's body (*id.*).

Upon re-direct examination, Petitioner testified that he did not clearly recall everything that happened on September 9, 1997, because he was under the influence of drugs and alcohol (*id.* at 408).  Upon further questioning, Petitioner stated that he felt somewhat crazy on the date of the incident (*id.* at 410).

The defense rested (*id.* at 411).  Petitioner's counsel renewed his earlier motion for JOA and requested a directed verdict based on the same arguments he made during his first motion for JOA (*id.* at 413).  Petitioner's counsel argued further that, with the additional testimony of Petitioner, reasonable men and women could not return a verdict of guilty as to first degree murder (*id.*).  The trial court denied the motion (*id.*).  Outside the presence of the jury and upon questioning by the trial court, Petitioner waived his right to the defense of voluntary intoxication (*id.* at 428).  The court found this waiver to be voluntarily and knowingly given (*id.* at 428–29).

Finally, Petitioner's attorney gave a closing argument and rebuttal, and the State gave its closing argument (*id.* at 437–87).  Before the verdict, the court asked Petitioner whether he was satisfied with the services of his attorney, to which he replied in the affirmative (*id.* at 521–22).

After deliberating six hours and forty minutes, the jury found Petitioner guilty of one count of second-degree murder with a weapon, a lesser included offense (*id.* at 524–32).

III.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19.  In relevant part, section 2254(d) now provides:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[4]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established

---

[4]Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

> Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'"  Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the state court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a state court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the state court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). The state court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the state court adjudication results in a "satisfactory conclusion." Williams, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see e.g. Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the

decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. See Panetti v. Quarterman, --- U.S. --- 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

IV.    EXHAUSTION AND DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[5] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. Duncan, 513 U.S. at 365-66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277-78.

---

[5]Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
          (A)  the applicant has exhausted the remedies available in the courts of the State; or
          (B) (i)  there is an absence of available State corrective process; or
               (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," id., 404 U.S. at 278, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court.  In Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt.  Id. 459 U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)).  The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law."  Anderson, 459 U.S. at 7 (internal quotation marks omitted).  The Court expressed doubt that a defendant's citation to a state court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim.  Id., 459 U.S. at 7 & n.3.  Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  Id.

Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364.  The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order

to obtain federal review of the issue.[6]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." Duncan, 513 U.S. at 365–66.  Recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." Baldwin v. Reese, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004). The Baldwin Court commented that "a litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" Id., 541 U.S. at 32.  With regard to this statement, the Eleventh Circuit stated in McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion.  However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'" McNair [v. Campbell], 315 F. Supp. 2d at 1184 (quoting Vasquez v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)).  This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302–03 (citations omitted).[7]

---

[6]The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

[7]In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005).  The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review.  Bailey v. Nagle, 172 F.3d 1299, 1302–03 (11th Cir. 1999).  This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default.  *See* Coleman v. Thompson, 501 U.S. 722, 734–35 & n.1, 111 S. Ct. 2546, 2555 & n.1, 115 L. Ed. 2d 640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).  In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine.  Bailey, 172 F.3d at 1303.  In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar.  *Id*.  A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question.  *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question.  Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002).  The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision.  Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[8]  Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation

---

federal standards regarding extraneous materials in his brief, but relied on state law for his arguments.  *Id*.

[8]The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  Marek v. Singletary, 62 F.3d 1295, 1301-02 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541, 1549 (11th Cir. 1994).

of federal law.  Third, the state procedural rule must be adequate.  *Id.*  The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.  *Id.*

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim.  Tower, 7 F.3d at 210; Parker, 876 F.2d 1470.  "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim."  McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)).  Lack of counsel or ignorance of available procedures is not enough to establish cause.  Tower, 7 F.3d at 210.  To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him."  Schlup, 513 U.S. at 327.  Further:

> a substantial claim that constitutional error has caused the conviction of an innocent
> person is extremely rare.  To be credible, such a claim requires [a] petitioner to
> support his allegations of constitutional error with new reliable evidence -- whether
> it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical
> physical evidence -- that was not presented at trial.

*Id.*

Within this framework, the court will review Petitioner's claims.

V.    PETITIONER'S CLAIMS

A.    Ground One:  "The evidence was insufficient under due process of the Federal Constitution to establish second degree murder when the State offered no proof that petitioner acted with a depraved mind when he killed the victim in a state of panic due to her attack with a knife and continuing attempts to infect him with AIDS."

B.    <u>Ground Two:  "The trial court erred under due process of the Federal Constitution in denying motion for judgment of acquittal because the evidence failed to disprove self defense"</u>[9]

In Ground One, Petitioner contends that the State failed to present a prima facie case of premeditation or depraved mind; therefore, the evidence was insufficient to support a conviction for second degree murder (Doc. 1 at 4, 4B, 4C).  Petitioner claims that the evidence, which included a small cut on his chest and numerous scratches and scrapes on his body, his fingerprint on the knife blade, the victim's blood in several locations of the residence, and evidence that the victim was "crazy on crack when she attacked him," was sufficient to support his defense of self defense (*id.*).

Petitioner further argues that the evidence showed that he acted in the heat of passion, and therefore, he should have been convicted of manslaughter, not second degree murder (*id.* at 4C).  In Ground Two, Petitioner reasserts his argument that the evidence was sufficient to establish a claim of self defense (*id.* at 4, 4D, 4E).

Respondent concedes that Petitioner exhausted these claims in state court (Doc. 13 at 2).  Respondent argues that the evidence, which included multiple stab wounds to the victim with two (2) different weapons, was sufficient for a rational trier of fact to find Petitioner guilty of second degree murder under Florida law (*id.* at 5).

1.    Clearly Established Supreme Court Law

To satisfy the constitutional requirement of due process in a criminal trial, the State must prove beyond a reasonable doubt every fact that constitutes an essential element of the crime charged against the defendant.  <u>In re Winship</u>, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).  When considering the sufficiency of the evidence on review, the proper inquiry is not whether the reviewing court itself believes that the evidence established guilt beyond a reasonable doubt but "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319,  99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (citation omitted); *see also* <u>United States v. Thomas</u>, 987 F.2d 697, 701 (11th Cir. 1993) (citations omitted);

_____

[9]Petitioner essentially characterizes claims one and two as insufficiency of the evidence claims; therefore, the court will analyze these claims together.

Bishop v. Kelso, 914 F.2d 1468, 1470 (11th Cir. 1990) (citation omitted).  The reviewing court will not reweigh the evidence, but should view it in the light most favorable to the prosecution.  Jackson, 443 U.S. at 319; Cosby v. Jones, 682 F.2d 1373, 1382 (11th Cir. 1982).  Because jurors (or a judge, sitting as a trier of fact in a judge trial) are free to evaluate the credibility of testimony and the weight of the evidence, the court should assume that all conflicting inferences were resolved against the defendant.  Wilcox v. Ford, 813 F.2d 1140, 1143 (11th Cir. 1987).  "It is only where, after viewing the evidence in its most favorable light and making all credibility decisions in favor of the state the evidence still fails to at least preponderate in favor of the state, that we become concerned with conflicting inferences."  Cosby, 682 F.2d at 1383 (footnote omitted).

2.       Federal Review of State Court Decision

Petitioner presented his due process claim of insufficient evidence on direct appeal of his conviction.  Although the state appellate court's affirmance without opinion provides no guidance to this court in determining the rationale for its decision, this court must still defer to the state court decision unless review of the record shows that decision to be unreasonable.  See Helton v. Secretary for Dept. of Corrections, 233 F.3d 1322, 1326–27 (11th Cir. 2000); Delgado v. Lewis, 223 F.3d 976, 981–82 (9th Cir. 2000); Hannon v. Cooper, 109 F.3d 330, 335 (7th Cir. 1997).

Under Florida law in effect at the time of Petitioner's offense conduct, second degree murder was defined as follows:

> The unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual, is murder in the second degree and constitutes a felony of the first degree, punishable by imprisonment for a term of years not exceeding life or as provided in s. 775.082, s. 775.083, or s. 775.084.

Fla. Stat. § 782.04(2) (effective July 1, 1997).  Thus, to prove the crime of second degree murder, the State was required to prove the following elements beyond a reasonable doubt: (1) the victim was dead, (2) the death was caused by Petitioner's criminal act, and (3) there was an unlawful killing of the victim by an act imminently dangerous to another and demonstrating a depraved mind without regard for human life.  See The Florida Bar 2007 Florida Standard Jury Instructions in Criminal Cases, Fifth Edition, Part Two:  Instruction on Crimes, Chapter 7.4 Murder - Second Degree (2007)

(instruction adopted in 1981 and amended on July 10, 1997).  An act is "imminently dangerous to another and demonstrating a depraved mind" if it is an act or series of acts that:  (1) a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another, and (2) is done from ill will, hatred, spite or an evil intent, and (3) is of such a nature that the act itself indicates an indifference to human life.  *Id.*; Conyers v. State, 569 So. 2d 1360, 1361 (Fla. 1st DCA 1990) (citation omitted).

> Florida courts have further defined the intent element of second degree murder:

> "Depraved mind" within the second degree murder statute has been variously defined as importing malice in the sense of ill will, hatred, or evil intent, and as an inherent deficiency of moral sense and rectitude. Ramsey v. State, 114 Fla. 766, 154 So. 2d 855.  It has also been stated that malice is not limited in its meaning to hatred, ill will and malevolence, but "denotes a wicked and corrupt disregard of the lives and safety of others . . . a failure to appreciate social duty." 40 Am. Jur. 2d, Homicide, Section 50.

Hines v. State, 227 So. 2d 334, 335–36 (Fla. 1st DCA 1969).  Additionally, the Florida courts have recognized that within the category of second degree murder there exist varying gradations of cases because some acts are simply more depraved than others.  *Compare* Hines v. State, 227 So. 2d 334 (Fla. 1st DCA 1969) (act of purposely pointing gun at deceased's head from a very short distance and telling deceased that he "had a gun" and that she (the deceased) "should go out . . . and act like a squirrel and if he killed her . . . it wouldn't be no accident," certainly implied malice sufficient to support conviction for second degree murder even if defendant did not intend that the gun would fire), *and* Grissom v. State, 237 So. 2d 57 (Fla. 3d DCA 1970) (evidence was sufficient to support conviction for second degree murder of student where defendant, a junior high school student, was disciplined by a teacher for a rule violation; upon being disciplined, the defendant threatened to return and kill the teacher; a short time later he did return armed with a handgun and fired two shots at the teacher, wounding but not killing him; and while fleeing the building after shooting the teacher, he fired one shot up a stairway in the school building that struck and killed a student standing on the stairs), *with* Manuel v. State, 344 So. 2d 1317 (Fla. 3d DCA 1977) (defendant's act of pointing gun in a direction where one would think a shot could not result in harm to any person is conduct that falls far short of malice required to support conviction for second degree murder).

Viewed in a light most favorable to the State, the evidence presented by the State is sufficient to permit a rational juror to conclude beyond a reasonable doubt that the victim was unlawfully killed by an act that:  (1) a person of ordinary judgment would know was reasonably certain to kill or do serious bodily injury to another, and (2) was done from ill will, hatred, spite or an evil intent, and (3) was of such a nature that the act itself indicated an indifference to human life.

The State presented testimony from Dr. Cumberland, the medical examiner who performed an autopsy of the victim's body.  He testified regarding the victim's injuries as follows:

> Q [by the State]:  Dr. Cumberland, I would like to ask if based upon your training and experience you've become familiar with evaluating and in analyzing injuries upon persons in the way of scratches, bite marks and cuts and things of this nature?
>
> A [by Dr. Cumberland]:  Yes, I have.
>
> Q:      I would like to show you what's been introduced into evidence as State's Exhibits No. 7 and 8, the photographs of the body of the defendant Tyrone Ware, and ask you to examine them.
>
> A:      Okay.
>
> Q:      Did you see any evidence of bite marks upon the body of Tyrone Ware, sir?
>
> A:      No.  These are not injuries that are consistent with what I would describe as a bite mark.
>
> Q:      Do you see any stab wounds?
>
> A.      No, I do not.
>
> Q:      What is your opinion within a reasonable degree of medical certainty as to what is the nature of the marks upon the body of the defendant Tyrone Labaren Ware?
>
> A:      These are scratches or scrapes of the skin's surface.
>
> Q:      And what are they consistent with having been made by?
>
> A:      They're the type of things we see with fingernail scratches or a scratch with any object that's pulled along the skin like a fingernail.

Q:      Thank you.  Did you perform an autopsy of [the victim], sir?

A:      Yes, sir, I did.

. . . .

Q:      . . . Were there any other wounds to her neck, particularly internal wounds?

A:      Yes, there were.  In addition to the insize wound across the neck there was also bruising into the strap muscles which are the muscles that bind the skin that go up and connect your chest to your head so that you're able to move your head about in space.

        In addition, there was a fracture of the hyoid bone on the left side of her neck.  This is a horseshoe-shaped bone that sits right at the base of the tongue and it was fractured.  And it's commonly seen in fractures that involve pressure on the neck.

Q:      Would that be consistent with some form of strangulation?

A:      Yes sir.

Q:      And what sort of force would be required by a hand to cause that injury to her, sir?

A:      It takes a — in this instance it takes a force with use of the fingers opposed to the thumb grabbing in and squeezing very tightly.

Q:      Was that fatal in itself, sir, the fracture of the hyoid bone being the compress — reflecting the compression to the neck in the strangulation, would that wound be fatal in and of itself to [the victim] at that time?

A:      Yes, it could have.

. . . .

Q:      And, sir, also now, if you will, describe the wounds, and use the chart if it will help you locate them, to the chest, back and abdomen of [the victim].

A:      Okay.  What I'll do to make this brief is I'll divide the chest up into four quadrants.  And we do that usually by running a line straight down from the top of the breastbone down to the bottom of the breast bone and then by using a line across the chest usually at the nipple level.  We call this the right upper, left upper, right lower, left lower, all of them described in terms of the person rather than just looking at them.

. . . .

A:      Okay.  So these are the four quadrants that we are talking about.  In this right upper quadrant here, there were multiple small wounds just like you saw.  In fact,

they were — make sure I get my numbers rights.  There were 21 separate or discrete stab wounds to this right upper quadrant of her chest.  These were paired in — like we saw as well as individual little perforations.  And of the 21, five of them entered the chest cavity itself and two of those went into the lung tissue below this area of the chest.

Q:      When you say 21 wounds in that area, are we talking 21 separate holes or 21 pairs from a fork?

A:      21 separate holes.

Q:      Go ahead.

A:      Okay.  From there we'll go down to the right lower quadrant of the chest.  Here there were three separate stab wounds.  All of these went into the body cavities and perforated the lung and liver immediately below this area.

Q:      Did you write the number there so — write the number, sir, if you would, so we can keep track.

A:      Okay.  Now we're going to skip down to the abdomen real quickly.  There were four stab wounds — let me show you — four stab wounds located in the right lower quadrant of the abdomen.  These went into the peritoneal cavity but did not strike any vital organs.

Q:      The peritoneal cavity, what is that, sir?

A:      That is the cavity where the viscera is and the intestines and the liver and everything that resides inside that cavity.  Belly, I guess, would be the common or layman's term for that.  Then in the left upper quadrant of the chest again, there were six separate stab wounds, and of these, all six went into the chest cavity and struck the underlying lung.  Then on the back —

Q:      May I ask you a question about the ones in the front?  The ones in the front that you described, did any of them contact major arteries or veins inside as well?

A:      Actually they hit vital viscera in the lung.  The lung is a very vascular organ.  It did not hit any of the major arteries and things that you would associate with instantaneous death.

Then we switch over to the back.  And there were stab wounds located over the left posterior and across, over and to the right posterior.  And total, there were 39 separate stab wounds.  Of those 39, 10 entered the chest cavity, and those — of those

10, one of them went through and hit the pulmonary artery which would have caused death real quickly.  And the other went deep into the underlying lung tissue and would have caused a lot of bleeding.  So again, 39 stab wounds to the back region.

Q:      Doctor, you told us about the wound to the pulmonary artery causing death. How about the other wounds to the chest, abdomen and back; were they fatal in and of themselves, the ones into the lungs and liver?

A:      Had she not gotten medical care very quickly and been able to get to a surgical sweep to repair the damage, she would have died from those wounds.

Q:      And the pulmonary artery itself is fatal too?

A:      Yes, very quickly.

Q:      Doctor, you described these wounds to her chest, abdomen and back.  What sort of force are we talking about to inflict these wounds with an instrument assisted with the barbeque fork that you observed in the kitchen sink?

A:      It's the — the best way to describe it, it's the type of force that you would expect to use with a fork like that to run it through a quarter-inch piece of reinforced board, not the wood-type board but the fiber board.  It — as long as it doesn't hit an underlying rib it will go through at about that force.

Q:      And was that a fair amount of force on a relative basis in your experience?

A:      Yes, it is.
. . . .
Q:      Doctor, did you observe any other wounds upon [the victim's] body?

A:      Yes, I did.

Q:      And what other wounds did you observe on her body, sir?

A:      She also had injuries to the upper body extremities and to the lower extremities.  By that I mean the arms and legs.  On her upper extremities she had an area of contusion measuring three-quarter inches on the front part of her bicep region of her upper arm.

Q:      What do you mean by contusion?

A:      Bruise.

Q:      Okay.

A:      And she also had a two-and-three-fourths inch area of bruising overlying the left forearm in an area we call laterally, which means right in this region here, an area of bruising.  And then she also had small punctured wounds over the back side of her left forearm in this region, one of them measured a quarter of an inch, the other one measured half an inch in this region here.

Q:      In your training and experience what would have caused those?

A:      They were similar to the wounds that we saw on the chest and the back that would have been consistent with the same instrument.

Q:      With a fork?

A:      With the fork, right.  And then she also had a three-and-a-half-inch area of bruising in this region here.  It doesn't show well in this diagram.  But the inner part of the arm on the left just below the armpit, and this cut here just above the swell of the bicep below the shoulder on the inside of the arm.  And then she also had a linear scrape or abrasion over the front of her right knee which measured three-eighth inches, and then a similar-type wound over the front of her opposite knee.

Q:      Based on your training and experience, Doctor, how would you categorize these wounds to the extremities that you just told us about?  What are they known as in forensic pathology?

A:      These would fall within the classification of what we would call defense wounds.

Q:      Explain that.  What do you mean by that?

A:      They're in a location that we commonly see in people who are trying to defend themselves where they throw their arms up and above to protect vital areas. In the instance of someone coming at your head and face you throw your arms up with your forearms in front of your face to protect it.  They're coming at your abdomen you tend to curl up in almost a fetal position to again try to protect your vital organs.

Q:      Doctor, you told us about a number of wounds here to the head and neck, the incisions, as well as the hyoid, the chest, the abdomen, the back, as well as these defensive wounds to the extremities.  What is your opinion to a reasonable degree of medical certainty as to whether or not all these wounds were incurred or sustained by [the victim] at or about the same time?

A:      In my opinion all these wounds occurred right around the same time frame, within hours of each other.  They were all what we call vital injuries in that the person was alive when they were inflicted.

. . . .

Q:      Doctor, did you form an opinion within a reasonable degree of medical certainty as to the manner of death of [the victim]?

A:      Yes, I did.

Q:      What is your opinion as to the manner of death at that time, sir?

A:      In my opinion this death would be classified or should be classified as a homicide.

Q:      And to a reasonable degree of medical certainty, did you form an opinion as to the cause of death of [the victim] on or about September 9th, 1997 based upon the injuries you've testified to here today?

A:      Yes, I did.

Q.      And what is your opinion as to the cause of death, sir?

A:      In my opinion she died as a result of compression of the neck that we saw in the hyoid bone in the neck region as well as multiple stab wounds to the chest, the back and the abdomen.

Q:      So it would be both of those, it would be both the stab wounds and the compression of the neck?

A:      Yes, sir.

(Doc. 11, Ex. C at 242–43, 267–77).

Petitioner testified in his own defense, and he admitted on cross-examination that he stabbed the victim in the back with a knife three times in the living room, then they moved to the bathroom where he stabbed her in the front with a barbecue fork numerous times and slashed her throat twice, and then the victim collapsed into the bathtub and died (Doc. 11, Ex. D at 376, 379–80, 32–84, 389).

Dr. Cumberland's testimony regarding the extent of the victim's injuries, which was somewhat corroborated by Petitioner's testimony, as well as Dr. Cumberland's testimony regarding the amount of force required to inflict those injuries, was sufficient to indicate "a wicked and corrupt

disregard of the lives and safety of others." *See* <u>Hines</u>, 227 So. 2d 334; <u>Grissom</u>, 237 So. 2d 57. Therefore, Petitioner has failed to demonstrate that the state court's denial of his insufficiency of the evidence claim was contrary to or an unreasonable application of Supreme Court law.

      C.    <u>Ground Three: "The Trial Court committed reversible error under due process of the Federal Constitution when the petitioner was not permitted to introduce testimony that the victim may have had AIDS or that subsequent to his contact with the victim he is now HIV positive."</u>

Petitioner contends that he was denied fundamental due process when the trial court excluded evidence relating to whether he contracted AIDS after having contact with the victim and whether the victim was HIV positive (Doc. 1 at 5; Doc. 15 at 9). Petitioner argues that this evidence was material because it would have supported a self-defense claim (*id.*).

Respondent concedes that Petitioner exhausted this claim in state court (Doc. 13 at 2). Respondent argues that the trial court did not violate clearly established Supreme Court law when the court prohibited introduction of testimony regarding whether the victim or Petitioner had AIDS because the evidentiary ruling did not inhibit Petitioner's ability to present a defense as Petitioner presented a theory of self defense based upon his being under imminent attack by a knife (*id.* at 13–14). Respondent further argues that the evidence was irrelevant to Petitioner's self-defense theory because there was no evidence that Petitioner was in danger of "attack by AIDS" at the time he killed the victim, since AIDS had already been transmitted to him during sexual relations with the victim which occurred prior to the altercation that caused the victim's death (*id.*).

      1.    Clearly Established Supreme Court Law

Federal habeas relief is available to correct only constitutional injury. 28 U.S.C. § 2254(a); <u>Wainwright v. Goode</u>, 464 U.S. 78, 104 S. Ct. 378, 78 L. Ed. 2d 187 (1983); <u>Engle v. Isaac</u>, 456 U.S. 107, 102 S. Ct. 2976, 73 L. Ed. 2d 1361 (1981); <u>Sims v. Singletary</u>, 155 F.3d 1297, 1312 (11th Cir. 1998). Errors of state law which do not infringe upon a defendant's constitutional rights provide no basis for federal habeas corpus relief. Questions regarding state evidentiary rulings may be reviewed only when the alleged errors at trial "so infused the trial with unfairness as to deny due process of law." <u>Felker v. Turpin</u>, 83 F.3d 1303, 1311 (11th Cir. 1996) (quoting <u>Lisenba v. California</u>, 314 U.S. 219, 228, 62 S. Ct. 280, 286, 86 L. Ed. 166 (1941)); *see also* <u>Estelle v. McGuire</u>, 502 U.S. 62, 72, 112 S. Ct. 475, 482, 116 L. Ed. 2d 385 (1991). The erroneous ruling

must have "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S. Ct. 1710, 1722, 123 L. Ed.2d 353 (1993). "A denial of fundamental fairness occurs whenever the improper evidence is material in the sense of a crucial, critical, highly significant factor." Snowden v. Singletary, 135 F.3d 732, 737 (11th Cir. 1998) (quotation omitted).

        2.      Federal Review of State Court Decision

Petitioner presented this due process claim to the First DCA on direct appeal of his conviction, and the First DCA affirmed the conviction without issuing a written opinion (see Doc. 13, Ex. G at 9, Ex. J). As with Petitioner's previous claims, although the state appellate court's affirmance without opinion provides no guidance to this court in determining the rationale for its decision, this court must still defer to the state court decision unless review of the record shows that decision to be unreasonable. See Helton, 233 F.3d at 1326–27; Delgado, 223 F.3d at 981–82; Hannon, 109 F.3d at 335.

Petitioner contends that he was denied fundamental due process when the trial court excluded evidence relating to whether he contracted AIDS after having contact with the victim and whether the victim was HIV positive (Doc. 1 at 5; Doc. 15 at 9). The record reflects that the trial court held a preliminary hearing on the State's motion in limine to exclude evidence showing that the victim had the AIDS virus, as well as evidence relating to whether Petitioner contracted AIDS after having contact with the victim. In its motion, the State asserted that there was evidence that Petitioner and the victim had sexual relations, and immediately prior to the altercation that led to the victim's death, the victim told Petitioner that he would die anyway because she had AIDS (id., Ex. A at 15). The State conceded that the victim's statement that she had AIDS would be relevant to prove Petitioner's state of mind; however, the State argued that evidence that Petitioner actually contracted AIDS after contact with the victim was inadmissible hearsay because the only purpose for which it could be offered was to prove the truth of the victim's statement that she did, in fact, have AIDS (id., Ex. B at 24–25).

Defense counsel argued that the statement was not hearsay and that it was admissible to prove Petitioner's self-defense claim (id., Ex. B at 26). Defense counsel further argued that the

exclusion of this evidence would be reversible error because evidence of Petitioner's state of mind was critical to his defense of self defense and justifiable homicide (*id.*).

The trial court granted the State's motion in limine on the ground that evidence of whether the victim actually had AIDS and whether Petitioner contracted the disease from their sexual encounter was of little probative value to the issue of self defense:

> [COURT]:  Let me just say this: There's absolutely no doubt of any evidence that a statement was made by her regardless of whether it was true or not. The statement made by her to the effect that, I've got HIV and now you're going to have it and you're going to die, is absolutely relevant to show what his frame of mind was or may have been at the time. Now, of course, that's not hearsay because it doesn't go to prove the truth of the matter asserted; it goes to show his state of mind at the time.
>
> Where I'm feeling a bit of disconnect with probative value is — my understanding is that defense counsel is suggesting that the truth of that statement may have some probative value as it relates to a defense theory of the case.  And from what I've heard you say, the defense theory is that if a person with HIV is making a threat, then that creates a right of justifiable use of deadly force just as if a threat of a knife or other deadly vehicle or other deadly instrumentality was to be used, and that the truth of the matter asserted there would then become significant.
>
> Let me just tell you where the disconnect comes for me in the logic and reasoning of that.  If a person is facing another person with a knife or gun or some other dangerous instrumentality, it is entirely within the person's means — of course, assuming that they physically had the means and ability to do it, but assume that for a moment.  A person standing before this defendant or any defendant stands with a dangerous instrumentality which they have the ability to use, and it creates in that defendant a fear that there is an imminent danger of the use of that instrumentality against him in the way that's likely to cause death or great bodily harm to him. That's the — the typical scenario in which the defense of self-defense comes about. If a person stands before him and threatens him because they have AIDS or they're HIV positive, the truth or not of that statement has no relevance as to the ability of that person to wield harm on the defendant.  In other words, for him to contract HIV he has to participate with the defendant in some fashion.  She can't simply threaten him with HIV or AIDS or make a suggestion that sexual involvement with her either will or has given that to him without his participation in the event.  Now, if the event has already occurred, then the threat has come and gone and it's no longer a threat, it's a matter of fact.  If it's a threat of future harm, it's not harm that she can inflict without him participating in some fashion.  That's where the disconnect as to the probative value comes in.

(Doc. 13, Ex. B at 28–30).  The trial court additionally determined that evidence regarding whether Petitioner had recently tested positive for HIV was irrelevant to the defense's theory that a person threatening another with HIV creates a right of justifiable use of deadly force (*id.*).

Upon consideration of the evidence that was excluded, that is, evidence relating to whether the victim had AIDS and whether Petitioner contracted the HIV virus during a sexual encounter with the victim prior to the lethal altercation, in conjunction with the evidence that was presented at trial in this case, the undersigned concludes that the excluded evidence had little if any probative value. Petitioner claimed that he killed the victim in self defense because she threatened him with a knife and told him that he was going to die because she had AIDS and had transferred the disease to him when they had sexual relations.  Petitioner was permitted to present evidence to support this defense in the form of his own testimony that he and the victim had sexual relations, they subsequently argued, the victim retrieved a knife from the kitchen, the victim put the knife near Petitioner's chest, and the victim told Petitioner that he was going to die because she had AIDS and had given him the disease during their sexual encounter earlier that night (Doc. 11, Ex. Bat 354–55).  Evidence of whether the victim actually had AIDS and whether Petitioner actually contracted the disease during their prior sexual encounter was irrelevant to Petitioner's state of mind <u>at the time of the altercation</u>, which was the issue relevant to Petitioner's theory of self defense.  Petitioner failed to show that the excluded evidence was critical to his defense; therefore, he failed to establish that the trial court's evidentiary ruling rendered his trial fundamentally unfair.  Accordingly, the state court's denial of Petitioner's due process claim was not contrary to or an unreasonable application of clearly established Supreme Court law.

D.     <u>Ground Four</u>: "Trial counsel denied petitioner a fair trial under the sixth amendment and the right to effective assistance of counsel for failing to investigate sources of evidence of mental health and prepare a potential defense of insanity."

E.     <u>Ground Five</u>:  "Trial Counsel denied Petitioner a fair trial under the Sixth Amendment and the right to effective assistance of counsel for failing to investigate the affirmative defense of voluntary intoxication to a specific-intent crime of first-degree murder, murder in the second, and manslaughter."[10]

---

[10]Although Petitioner asserts these claims as separate grounds in his habeas petition, he argues the same facts in support of both claims (*see* Doc. 1 at 5–5J).  Furthermore, the state court analyzed the claims together in its written order denying Petitioner's post-conviction motion (*see* Doc. 13, Ex. L at 365–67).  Therefore, for purposes of clarity and

Petitioner claims that he was denied the right to effective assistance of counsel during the trial proceedings because defense counsel, Mr. Etheridge, failed to investigate insanity and voluntary intoxication defenses (Doc. 1 at 5–5H). Petitioner contends that he was high on drugs and alcohol on the night of the killing such that he felt he was not in control of his thoughts or actions when the crime occurred (*id.* at 5E, 5H). He states he discussed with Mr. Etheridge the possibility of presenting a defense of temporary insanity based on the fact that he had consumed drugs and alcohol and did not feel that he was responsible for his actions, but Mr. Etheridge told him that a defense of temporary insanity or voluntary intoxication was not a viable defense and that he would not represent Petitioner if he insisted on asserting this type of defense (*id.* at 5, 5E, 5H, 5I).[11] Petitioner states that the bizarre events during the course of the offense should have prompted counsel to make a minimal investigation into his mental health (*id.* at 5E). Petitioner contends if counsel had investigated a defense of voluntary intoxication and temporary insanity defense, the result of his trial would have been different (*id.* at 5F).

1.    Clearly Established Supreme Court Law

The legal standard clearly established by the Supreme Court for ineffectiveness of counsel claims is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984). *See* Fugate v. Head, 261 F.3d 1206, 1216–17 (11th Cir. 2001); Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002) (both citing Williams v. Taylor and Strickland). The two components of an ineffectiveness claim under Strickland are performance and prejudice, and if an insufficient showing is made as to one, the court need not address the other. Strickland, 466 U.S. at 697, 104 S. Ct. at 2069; Wellington, 314 F.3d at 1260. In assessing performance, the court considers whether "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." 466 U.S. at 686, 104 S. Ct. at 2064. "The court must . . . determine whether, in light of all the circumstances, the identified acts or omissions

---

organization, the undersigned will address the claims together.

[11]Petitioner includes additional factual assertions concerning his mental health during his pre-trial detention at the county jail, including that he was under psychiatric care, he was taking several medications, and his family observed his "bizarre behavior" when they visited him at the jail (Doc. 1 at 5E, 5F, 5H, 5I). These facts are the same facts asserted by Petitioner in support of Ground Six, Petitioner's claim that counsel was ineffective for failing to seek a competency evaluation, and will be discussed in the court's analysis of that claim *infra*.

were outside the wide range of professionally competent assistance."  466 U.S. at 690, 104 S. Ct. at 2066.  Petitioner must show that "no competent counsel would have taken the action that his counsel did take."  Fugate, 261 F.3d at 1217 (citation omitted).

To establish ineffective assistance, Petitioner must provide factual support for his contentions regarding counsel's performance.  Smith v. White, 815 F.2d 1401, 1406–07 (11th Cir. 1987).  Bare, conclusory allegations are insufficient.  Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991).  Furthermore, "[a]n ambiguous or silent record is not sufficient to disprove the strong and continuing presumption . . . that [counsel] did what he should have done and that he exercised reasonable professional judgment."  Chandler v. United States, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc) cert. denied, 121 S.Ct. 1217, 149 L. Ed.2d 129 (2001).

Whether a particular decision by counsel was a tactical one is a question of fact, Hardwick v. Crosby, 320 F.3d 1127, 1163 (11th Cir. 2003), and the state court's resolution of that issue enjoys a strong presumption of correctness.  See 28 U.S.C. § 2254(e)(1); Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995); Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991).  Whether a particular tactical decision was a reasonable one, however, is a question of law, Hardwick 320 F.3d at 1163; Jackson, 42 F.3d at 1367; Horton, 941 F.2d at 1462.  In determining whether counsel's decision was reasonable, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 689, 104 S. Ct. at 2065.

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high.  Wellington, 314 F.3d at 1260.  The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'"  Id. (quoting Strickland, 466 U.S. at 693, 104 S. Ct. at 2067).  However, the Court has also clarified that a petitioner need not demonstrate it 'more likely than not, or prove by a preponderance of evidence,' that counsel's errors affected the outcome.  Strickland, 466 U.S. at 693–94, 104 S. Ct. at 2068.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694, 104 S. Ct. at 2068.  Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  Williams v. Taylor, 529 U.S. at 405–06, 120 S. Ct. at 1519.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. Strickland, 466 U.S. at 694–95, 104 S. Ct. at 2068.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 695, 104 S. Ct. at 2068–69.

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.  Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.  Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.

*Id.* at 695–96, 104 S. Ct. at 2069.

2.    Federal Review of State Court Decision

Petitioner presented these claims to the state court in his Rule 3.850 motion (Doc. 11, Ex. K at 81–89).  The trial court conducted a two-part evidentiary hearing on Petitioner's claims, at which Petitioner was represented by counsel (Doc. 11, Ex. L at 222–334).  In the written order denying Petitioner's claims, the trial court found as fact that Mr. Etheridge discussed potential defenses with Petitioner, including the perils of presenting insanity and voluntary intoxication defenses, and after consulting with Petitioner Mr. Etheridge decided that their trial strategy would revolve around self defense (Doc. 11, Ex. L at 365–66).  The trial court also determined that counsel's decision to forego a defense of temporary insanity or voluntary intoxication was a reasoned, tactical decision (Doc. 11, Ex. L at 366).  Petitioner has failed to present clear and

convincing evidence to rebut the state court's findings; therefore, the trial court's factual findings are presumed correct.

The state court did not specifically cite to any United States Supreme Court case for the standard to be applied in resolving Petitioner's claim.  However, as previously noted, a state court is not required to cite United States Supreme Court cases or even be aware of the cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early, 537 U.S. at 8.  In the instant case, the state court's reasoning did not contradict Strickland.  The state court determined that defense counsel made a tactical decision to pursue a defense theory of self defense and forego theories of temporary insanity and voluntary intoxication, and the court determined that counsel's decision was reasonable.  This reasoning does not contradict the requirement that Petitioner show that counsel performed deficiently, that is, in a manner that no reasonable counsel would perform.  Furthermore, Petitioner has not shown that the state court reached an opposite conclusion from the United States Supreme Court on a question of law, and Petitioner has not identified any United States Supreme Court case with a set of materially indistinguishable facts that was decided differently from his case, nor is the court aware of any such case.  Therefore, Petitioner has failed to show that the state court's decision was contrary to Supreme Court law.

Additionally, Petitioner has failed to show that the state court's decision constituted an unreasonable application of Strickland.  To succeed on his claim, Petitioner must establish that his counsel's decision to forego a defense of temporary insanity or voluntary intoxication was so patently unreasonable a strategic decision that no competent attorney would have chosen this strategy.  See Dorsey v. Chapman, 262 F.3d 1181, 1186 (11th Cir. 2001) (citation omitted).

> Trying cases is no exact science.  And as a result, we must never delude ourselves that the fair review of a trial lawyer's judgment and performance is an activity that calls for great precision or for a categorical approach.  When reviewing whether an attorney is ineffective, courts "should always presume strongly that counsel's performance was reasonable and adequate."  Atkins v. Singletary, 965 F. 2d 952, 958 (11th Cir. 1992).  And, "a court should be highly deferential to those choices . . . that are arguably dictated by a reasonable trial strategy."  Devier v. Zant, 3 F.3d 1445, 1450 (11th Cir. 1993).  Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it can be shown that no reasonable lawyer, in the circumstances, would have done so.

Rogers v. Zant, 13 F. 3d 384, 386 (11th Cir. 1994); *see also* Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir. 2001) (to show counsel's performance was unreasonable, defendant must establish that no competent counsel would have taken the action that his counsel did take); Chandler, 218 F.3d at 1313 (issue is not what is possible, prudent, or appropriate, but what is constitutionally compelled) (citing Burger v. Kemp, 483 U.S. 776, 107 S. Ct. 3114, 3126, 97 L. Ed. 2d 638 (1987)).

     As stated by the Eleventh Circuit:

> No absolute rules dictate what is reasonable performance for lawyers. [citing Strickland, 104 S. Ct. at 2065; other citations omitted]. "Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." Strickland, 104 S. Ct. at 2065; [other citations omitted]. The law must allow for bold and for innovative approaches by trial lawyers. And, the Sixth Amendment is not meant "to improve the quality of legal representation," but "simply to ensure that criminal defendants receive a fair trial." Strickland, 104 S. Ct. at 2065.

Chandler, 218 F.3d at 1307. In determining whether counsel's decision was reasonable, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.

     "[C]ounsel has a duty to make reasonable investigation or to make a reasonable decision that makes particular investigation unnecessary. . . . [A] particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691; *see also* Williamson v. Moore, 221 F.3d 1177, 1180 (11th Cir. 2000); Holsomback v. White, 133 F.3d 1382, 1387 (11th Cir. 1998). "In general, defense counsel renders ineffective assistance when [he] fails to investigate adequately the sole strategy for a defense or to prepare evidence to support that defense." Fortenberry v. Haley, 297 F.3d 1213, 1226 (11th Cir. 2002). Counsel's duty to investigate "requires that counsel 'conduct a substantial investigation into any of his client's plausible lines of defense.'" *Id.* (citation omitted). No absolute duty exists to investigate particular facts or a certain line of defense. Williamson, 221 F.3d at 1180; Chandler, 218 F.3d at 1317. The mere existence of alternate strategies or approaches, even better ones, does not render counsel's strategy ineffective. Chandler, 218 F.3d at 1314. Counsel cannot be found incompetent "as long as the approach taken 'might be considered sound

trial strategy.'" *Id.* (quoting <u>Darden v. Wainwright</u>, 477 U.S. 168, 106 S. Ct. 2464, 2474, 91 L. Ed. 2d 144 (1986)).   Petitioner bears the heavy burden of persuasion to disprove that counsel's performance was competent and reasonable by showing that no competent counsel would have chosen the course of action that his counsel in fact took. *Id.* at 1314–15 & n.16.

As noted *supra*, whether a particular decision by counsel was a tactical one is a question of fact, <u>Hardwick</u>, 320 F.3d at 1163, and the state court's resolution of that issue enjoys a strong presumption of correctness. *See* 28 U.S.C. § 2254(e)(1); <u>Jackson</u>, 42 F.3d at 1367; <u>Horton</u>, 941 F.2d at 1462.   Whether a particular tactical decision was a reasonable one, however, is a question of law, <u>Hardwick</u> 320 F.3d at 1163; <u>Jackson</u>, 42 F.3d at 1367; <u>Horton</u>, 941 F.2d at 1462.

In the instant case, Petitioner has failed to satisfy his burden of demonstrating that counsel's tactical decision to forego a defense of temporary insanity or voluntary intoxication was unreasonable.   Evidence of defense counsel's reasons for choosing to forego defenses of insanity and voluntary intoxication is found in the trial transcript and the transcript of the evidentiary hearing in the Rule 3.850 proceedings.[12]   During a bench conference immediately prior to closing arguments at Petitioner's trial, Mr. Etheridge stated that he discussed voluntary intoxication as a potential defense with Petitioner, but he (Etheridge) never considered voluntary intoxication or insanity as a viable defense in Petitioner's case (Doc. 11, Ex. D at 426–27).   He stated that he made the strategic and tactical decision not to present voluntary intoxication as a defense because in his thirteen (13) years of practicing law, this defense was never successful (*id.*).   Mr. Etheridge further stated that it was his experience that the voluntary intoxication defense had a "backlash effect" and was often detrimental to the case (*id.*).   Additionally, at the 3.850 hearing, Mr. Etheridge testified that Petitioner never requested that he investigate an insanity defense because their focus, based on the facts of the case, was self defense (Doc. 11, Ex. L at 277).   Mr. Etheridge further stated that he never considered temporary insanity as a viable defense in this case, and he made the tactical decision not to pursue that defense (*id.* at 280).   He testified that he made a strategic choice to pursue self defense to the exclusion of other defenses (*id.* at 281).   Mr. Etheridge stated that he had never won a case

---

[12]The record establishes that the same state court judge presided at Petitioner's trial and during the Rule 3.850 proceedings.

based on voluntary intoxication, therefore he did not believe this was a viable defense (*id.* at 281–82).  Petitioner admitted at the evidentiary hearing that he and Mr. Etheridge discussed an insanity defense, but Mr. Etheridge stated that he did not want to pursue that defense (*id.* at 256–57).

Additionally, there was evidence indicating that Petitioner was thinking clearly immediately after the offense.  For example, Petitioner testified that he put the victim in the bathtub to wash off his fingerprints (Doc. 11, Ex. B at 359).  He also stated that he put on gloves when he moved the victim's body because he did not want to contract a disease (*id.* at 358).  Petitioner also testified that he knew that "it would be a long time before [he] saw [his] freedom" (*id.* at 360).  Officer Brooks testified that Petitioner admitted in the back of the police car, "I'm in a world of trouble, Brooks" (*id.* at 113–14).

Based upon the trial court's unrebutted factual finding that defense's counsel's decision to forego insanity and voluntary intoxication defenses was a tactical decision, together with the record evidence of counsel's reasoning for his decision, the undersigned concludes that Mr. Etheridge's decision not to pursue insanity and intoxication defenses was reasonable.  Mr. Etheridge had been practicing criminal law for over twelve years, and with this extensive criminal law experience, it is reasonable to conclude that he had formed an accurate picture of which lines of defense were most likely to succeed.  Additionally, Petitioner's own actions and statements shortly after the killing would have undermined a defense that he was unable to understand what he was doing or that his conduct was wrong during commission of the offense.  Furthermore, under Petitioner's proposed defense of voluntary intoxication, counsel would have had to adduce evidence that Petitioner's long-term and continued drug and alcohol usage produced "a fixed and settled frenzy or insanity either permanent or intermittent," *see* Kiley v. State, 860 So. 2d 509, 510–11 (Fla. 4th DCA 2003 (quoting Gray v. State, 731 So. 2d 816, 818 (Fla. 5th CA 1999)), which counsel believed could have evoked a significant amount of prejudice by the jury.  Thus, the possible prejudice resulting from the proposed insanity and intoxication theories was foreseeably more severe than that resulting from the defense Mr. Etheridge actually presented at trial, self defense.  Moreover, as discussed *infra*, by not presenting any witnesses other than Petitioner in his case-in-chief, Mr. Etheridge gained an important tactical advantage of both opening and closing final arguments to the jury.  Mr. Etheridge would have forfeited this tactical advantage had he presented the proposed insanity and intoxication

defense theories that Petitioner proposes — unless he called only Petitioner as a witness to testify with regard to those theories, testimony that might have been considered self serving.  In light of these factors, Petitioner has failed to demonstrate that Mr. Etheridge's decision to pursue self defense to the exclusion of all other defenses was not so patently unreasonable that no competent attorney would have chosen this trial strategy.  Thus, Petitioner is not entitled to habeas relief on this claim.

F.     Ground Six:  "Trial counsel denied Petitioner a fair trial under the Sixth amendment and the right to effective assistance of counsel where Petitioner was being involuntarily medicated with the psychotropic drugs 'Thorazine; Haldol; Prozac; Depakote; Mellaril; Flexeril; and Cogentin.'  Did he suffer diminished capacity to aid his counsel in his defense?"

Petitioner contends counsel was ineffective for failing to request a competency hearing (Doc. 1 at 5K–5N).  Petitioner states that while he was at the county jail awaiting trial, he was taking Haldol, Prozac, Depakote, Vistaril, Flexeril, Cogentin, Mellaril, and Thorazine, he was under the care of a psychiatrist, and he was being housed in a "psychological adjustment cell" (*id.* at 5I, 5K). Petitioner states he told defense counsel that he was having difficulty thinking clearly and sleeping, he was feeling paranoid, depressed, confused, and "out of balance," and he was unable to logically comprehend and communicate (*id.* at 5L).  Petitioner contends defense counsel should have made the trial court aware of these facts, and if counsel had done so, the trial court would have ordered a competency evaluation (*id.* at 5L–5M).

1.     Clearly Established Supreme Court Law

The clearly established Supreme Court law applicable to claims of ineffective assistance of counsel is set forth *supra*.

2.     Federal Review of State Court Decision

Petitioner presented this claim in his Rule 3.850 motion.  In the written decision denying Petitioner's claim, the trial court determined that the evidence showed that Mr. Etheridge perceived Petitioner as bright and coherent, and that he (Etheridge) was unaware that Petitioner was taking any medications stronger than Paxil or Prozac (Doc. 11, Ex. L at 366).  The court determined that the evidence further showed that Petitioner assisted Mr. Etheridge in formulating a defense strategy and throughout the trial (*id.*).  Therefore, the court concluded, Mr. Etheridge made a reasonable decision

not to have Petitioner psychologically evaluated (*id.*).  The trial court additionally noted that although Petitioner testified at the evidentiary hearing that he was under the influence of medications, he could not recall with certainty the exact medications he was on, and he failed to present any other evidence that he was under the influence of medications during the period preceding trial (*id.*).

Initially, Petitioner argues that the state court's finding that he failed to present any evidence that he was under the influence of medications during the period preceding trial is rebutted by the transcript of the evidentiary hearing and the medical records attached to his Rule 3.850 motion, therefore, that finding is not entitled to deference (*see* Doc. 1 at 5M–5N).  Review of the record confirms Petitioner's position.  At the evidentiary hearing, Petitioner testified that while he was in pre-trial detention at the county jail, he was medicated with Thorazine, Prozac, Haldol, Mellaril, Cogentin, Flexeril, Benadryl, and Vistaril (Doc. 11, Ex. L at 236).  Additionally, Petitioner's post-conviction counsel asked the court to consider the medical records included in an exhibit attached to Petitioner's Rule 3.850 motion (*id.*). This evidence clearly rebuts the trial court's finding that there was no evidence of the medications Petitioner was taking prior to trial; therefore, this factual finding is not entitled to deference.  Petitioner has not, however, rebutted the state court's findings that Mr. Etheridge perceived Petitioner as bright and coherent, that he (Etheridge) was unaware that Petitioner was taking any medications stronger than Paxil or Prozac, and that Petitioner assisted Mr. Etheridge in formulating a defense strategy and throughout the trial; therefore, those factual findings are entitled to deference.  In light of these findings, and upon review of the evidence in the state court record, including Petitioner's medical records attached to his Rule 3.850 motion, the undersigned must determine whether Mr. Etheridge's decision not to have Petitioner psychologically evaluated to determine his competency was reasonable (*id.*).

The due process clause prohibits the trial of a person who is mentally incompetent.  Sheley v. Singletary, 955 F.2d 1434 (11th Cir. 1992) (citations omitted).  The standard for determining competency to stand trial is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of understanding — and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 80 S. Ct. 788, 789, 4 L. Ed. 2d 824 (1960); Stinson v. Wainwright, 710 F.2d 743, 745 (11th Cir. 1983).  Further:

> The burden on the petitioner seeking federal habeas relief on grounds of incompetency is heavy. . . . "Courts in habeas corpus proceedings should not consider claims of mental incompetence to stand trial where the facts are not sufficient to positively, unequivocally, and clearly generate a real, substantial, and legitimate doubt as to the mental capacity of the petitioner."

Sheley, 955 F.2d at 1438 (quoting Reese v. Wainwright, 600 F.2d 1085, 1091 (5th Cir. 1979)).

A lifelong history of mental illness and emotional problems does not demonstrate incompetency without a specific showing of how these difficulties generated a substantial doubt as to petitioner's competency at the time in question.  Medina v. Singletary, 59 F.3d 1095, 1106 (11th Cir. 1995); Card v. Singletary, 981 F.2d 481 (11th Cir. 1992).  Similarly, the fact the accused is undergoing treatment with psychiatric drugs, while relevant, does not alone prove incompetence. Sheley, 955 F.2d at 1438–39.  In order to establish incompetence, evidence must establish that the drugs affected the accused to the point that he could not effectively consult with his attorney and could not understand the proceedings.  Id. at 1439.  Furthermore, "[a] bare allegation of the level of psychotropic drugs administered to petitioner before entering his plea [or going to trial] . . . is insufficient to meet this evidentiary threshold."  Id.  As with all claims of ineffective assistance, "Petitioner must show that counsel's representation 'fell below an objective standard of reasonableness' and that the 'deficient performance prejudiced the defense.'"  Id. (quoting Strickland, supra).

In the instant case, Petitioner has failed to establish that counsel's decision to forego a competency evaluation was unreasonable.  At the post-conviction evidentiary hearing, Mr. Etheridge testified that Petitioner always presented  himself as an alert and intelligent individual, and that he (Etheridge) never had any indication that Petitioner suffered from any type of mental problems or illnesses (Doc. 11, Ex. L at 284).  Additionally, Mr. Etheridge testified that while he was aware that Petitioner was taking "something like Paxil or Prozac," Petitioner always seemed lucid and coherent throughout the proceedings, and Petitioner communicated with him throughout the entire trial with the use of a legal pad (id. at 283, 298).

Moreover, a review of Petitioner's medical records submitted in support of his Rule 3.850 motion indicates that, while incarcerated and awaiting trial, Petitioner was diagnosed with mild

depression and anger management issues (*see* Doc. 11, Ex. K at 120–43).[13]  To place Petitioner's medical records in temporal context, it is important to note that Petitioner was incarcerated in September of 1997, Mr. Etheridge began representing him in December of 1997, and Petitioner's trial occurred in January of 1999.  According to the records, the jail physicians prescribed the following medications to Petitioner for his mental health issues prior to trial:  (1) Prozac (prescribed 20 mg on February 23, 1998, but discontinued on April 24, 1998; prescribed 20 mg on April 22, 1998, but discontinued on June 21, 1998; prescribed 20mg on June 11, 1998, but discontinued on August 13, 1998; prescribed 40 mg on December 10, 1998) (*id.* at 128, 134–37); (2) Depakote (prescribed 250 mg on June 11, 1998, but discontinued on July 30, 1998, and August 13, 1998, respectively) (*id.* at 121, 137); (3) Vistaril (prescribed 50 mg on June 11, 1998, but discontinued on July 22, 1998; prescribed 50 mg on July 30, 1998, but discontinued on August 13, 1998; prescribed 50 mg on December 10, 1998) (*id.* at 121, 128, 137); (4) Mellaril (prescribed on July 30, 1998, but discontinued on August 3, 1998; prescribed on September 24, 1998) (*id.* at 121); (5) Thorazine (prescribed 50 mg on August 3, 1998; prescribed 50 mg on November 3, 1998, but discontinued on December 3, 1998) (*id.* at 121, 133); (6) Haldol (prescribed 5 mg on December 10, 1998) (*id.* at 128); (7) Congentin (prescribed 1 mg "until next appointment" on December 28, 1998) (*id.* at 120).[14] A review of Petitioner's "Infirmary Mental Health Progress Notes" reveals that Petitioner was not suicidal immediately after his arrest.  For example, on September 9, 1997, an Escambia County Jail mental health counselor (hereafter "counselor") asked him whether he was suicidal and Petitioner replied, "Man, I've got a lot on my mind, I'm alright" (*id.* at 129).  Additionally, on September 11, 1997, the counselor noted that "client is oriented," "denies hallucinations," "denies drug use," and states, "I'm not crazy, I just have a lot on my mind" (*id.*).  Several of Petitioner's progress notes indicate that he had an anger problem while incarcerated (*see, e.g., id.* at 130 (client bangs on screens and tends to have a problem accepting the rules); *id.* at 132 (client had anger problems

---

[13]Not all of Petitioner's medical records are legible, and Petitioner did not provide other evidence of the content of his records, for example, an affidavit from a medical provider; therefore, the discussion of Petitioner's medical records includes only those records which the undersigned was able to decipher.

[14]The amount of milligrams of Mellaril is unknown.  Additionally, some of the dates the medications were discontinued, if discontinued, are also unknown.

during the session but eventually became calm and appropriate); *id.* at 127 (client has anger problems and other inmates have noticed; however, he seems to be working on his anger problems)). On November 30, 1998, the counselor prepared a progress note indicating that Petitioner was not psychotic but was mildly depressed (*id.* at 131).  Although on December 10, 1998, Petitioner told his counselor that he was "hearing ghosts," the counselor also noted that Petitioner's progress was fair, and his judgment was adequate (*id.* at 128).  On January 5, 1999, Petitioner told his counselor that he thought his case was ready for trial, but his attorney had not shown up yet (*id.* at 127).  On the same day, the counselor noted that Petitioner was alert, was not delusional, and that his "reality contact [was] good" (*id.*).[15]

All of this evidence leads the undersigned to conclude that Petitioner failed to demonstrate that counsel's decision to forego a competency evaluation was unreasonable.  Mr. Etheridge testified that Petitioner communicated with him prior to and during the trial, and that he never suspected that Petitioner had mental health issues which would warrant a competency evaluation.  Petitioner's medical records indicate that Petitioner was coherent throughout the pre-trial process and, although he was diagnosed with mild depression and anger management issues, there was no indication that he was psychotic, disoriented, or unable to communicate with his attorney.  Furthermore, Petitioner has failed to establish a reasonable probability that the outcome of the proceeding would have been different if counsel had requested a competency evaluation.  Therefore, Petitioner the state court's denial of Petitioner's claim was not unreasonable.

G.   <u>Ground Seven: "Whether trial counsel denied petitioner of a fair trial under the Sixth Amendment and the right to effective assistance of counsel for failing to investigate a potential defense witness that the petitioner had identified?"</u>

Petitioner claims that Mr. Etheridge was ineffective because he failed to investigate a potential defense witness, Kenny Royster (Doc. 11 at 5Q).  Petitioner contends that this witness could have testified regarding the victim's propensity for violence after smoking crack (*id.*). Although this witness did not observe any of the events leading up to the victim's death, Petitioner

---

[15]In addition to presenting medical records, Petitioner testified at his 3.850 hearing that he had depression and anger management issues (Doc. 11, Ex. L at 238–39).  Additionally, Petitioner testified that the jail changed his medication "every other week" (*id.* at 236).

asserts that Mr. Royster would have testified that the victim had pulled a knife on him in the same manner in which she attacked Petitioner (*id.*).

>    1.    Clearly Established Supreme Court Law

The clearly established Supreme Court law applicable to claims of ineffective assistance of counsel is set forth *supra*.

>    2.    Federal Review of State Court Decision

At the first evidentiary hearing on Petitioner's Rule 3.850 motion, Petitioner's post-conviction counsel orally amended the Rule 3.850 motion to include this claim.[16]  In the written order denying the claim, the trial court found as fact that Mr. Etheridge made a tactical decision not to call Kenny Royster as a defense witness, and counsel's reason for this decision was that he wished to maintain first and last closing argument (Doc. 11, Ex. L at 366).  The state court concluded that this was a reasonable decision, and therefore, Petitioner failed to establish that his counsel was ineffective (*id.*).

As with Petitioner's previous ineffective assistance of counsel claims, although the state court did not specifically cite to any United States Supreme Court case for the standard to be applied in resolving Petitioner's claim, Petitioner has not shown that the state court reached an opposite conclusion from the United States Supreme Court on a question of law.  Furthermore, Petitioner has not identified any United States Supreme Court case with a set of materially indistinguishable facts that was decided differently from his case, nor is the court aware of any such case.  Therefore, Petitioner has failed to show that the state court's decision was contrary to Supreme Court law.

Additionally, Petitioner's has failed to demonstrate that the state court's denial of his claim was based upon an unreasonable determination of the facts.  Petitioner has failed to present clear and convincing evidence to rebut the state court's factual findings that Mr. Etheridge made a tactical

---

[16]During the first evidentiary hearing, over the State's objection, the court allowed Petitioner's 3.850 counsel to question Petitioner regarding whether Mr. Etheridge interviewed a potential defense witness, Kenny Royster (*id.*, Ex. L at 241).  Petitioner testified that Mr. Etheridge did not interview Mr. Royster because his trial strategy was to keep first and last closing argument, therefore Mr. Etheridge indicated that he would not call any defense witnesses (*id.*, Ex. L at 242).  In an apparent effort to give Petitioner the opportunity to raise all claims during the 3.850 proceedings, the trial judge allowed Petitioner to develop this claim even though he had not raised the claim in his 3.850 motion.  Additionally, the trial judge held a second 3.850 hearing; however, no factual evidence was developed regarding Petitioner's allegations that Mr. Etheridge was ineffective for failing to investigate a defense witness (*id.*, Ex. L at 309– 34).

decision not to call Kenny Royster as a defense witness, and counsel's reason for this decision was that he wished to maintain first and last closing argument.  Therefore, those factual findings are presumed correct.

The remaining issue is whether the state court's denial of Petitioner's claim was an unreasonable application of Strickland.  This inquiry requires the court to determine whether counsel's decision not to call Kenny Royster was reasonable.  As previously noted, the state court found as fact that the reason for counsel's choosing not to present testimony from Mr. Royster was counsel's desire to maintain a first and last closing argument.  This is an important tactical advantage that would have been forfeited if counsel had presented the testimony of Mr. Royster. See Durain v. McNeil, 2:03-cv-FtM-29DNF, 2008 WL 4888989 *14 (M.D. Fla., Nov. 12, 2008) (counsel's ability to retain the right of presenting both opening and closing arguments to the jury has a distinct advantage).  Therefore, Petitioner failed to demonstrate that counsel's decision was one that no reasonable lawyer would have made.

Additionally, Petitioner has failed to establish a reasonable probability that the jury would have acquitted him if Mr. Royster had testified.  Petitioner does not allege that Mr. Royster was available to testify at trial.  Furthermore, although Petitioner speculates as to what Mr. Royster would have said if he had testified at trial, he has failed to proffer any actual evidence of the substance of Mr. Royster's proposed testimony, for example police reports, witness statements, an affidavit from Mr. Royster, or similar evidence.  This court will not "'blindly accept speculative and inconcrete claims . . . .'"  Raulerson v. Wainwright, 753 F.2d 869, 876 (11th Cir. 1985) (quoting Baldwin v. Blackburn, 653 F.2d 942, 947 (5th Cir. 1981)).  The burden of proof is on the petitioner in a habeas corpus proceeding.  Jones v. Estelle, 632 F.2d 490, 492 (5th Cir. 1980).[17]  In the absence of sufficient evidence showing that Mr. Royster would have provided material, favorable testimony, Petitioner has failed to show a reasonable probability that the result of his trial would have been different if defense counsel had presented Mr. Royster's testimony.  Therefore, Petitioner is not entitled to habeas relief on this claim.

---

[17]In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all former Fifth Circuit decisions rendered before October 1, 1981.

H.    Ground Eight:  "Whether trial counsel denied Petitioner of a fair trial and the right to effective assistance of counsel when counsel failed to adequately consult with petitioner on important issues and decisions regarding his defense?"

Petitioner claims that Mr. Etheridge was ineffective because he failed to adequately consult with Petitioner prior to trial (Doc. 1 at 5S).  He states Mr. Etheridge filed a notice of appearance in his case on December 4, 1997, and met with him only twice prior to the trial in January of 1999; the first meeting was in December of 1997 or January of 1998, and the second meeting was July of 1998 (*id.* at 5T–5U).  Petitioner further states that Mr. Etheridge failed to prepare him for his trial testimony (*id.* at 5U–5V).  Petitioner asserts he was prejudiced by counsel's failure to consult with him because if counsel had spent more time with him, he would have observed that Petitioner's demeanor was affected by the medication he was taking, and Mr. Etheridge would have requested a competency evaluation (*id.* at 5V).

Respondent argues that Petitioner failed to exhaust the claim of counsel's failure to adequately consult with him or prepare him for trial, apart from Petitioner's claim concerning counsel's failure to request a competency evaluation, because Petitioner did not present an independent claim of failure to consult in his Rule 3.850 motion nor did he amend his Rule 3.850 motion by raising or litigating this independent claim during either of the evidentiary hearings (Doc. 11 at 46–48).  Respondent additionally contends that Petitioner failed to raise this claim on appeal of the trial court's denial of his Rule 3.850 motion (*id.* at 48–49).  Therefore, Petitioner procedurally defaulted this claim in the state courts, and the claim is procedurally barred from federal review (*id.*).

In his reply brief, Petitioner contends that although the state court did not specifically address his claim that counsel failed to adequately consult with him, he presented this claim to the court by presenting evidence at the evidentiary hearings that Mr. Etheridge met with him only two or three times prior to trial, with each visit lasting no longer than thirty to forty-five minutes (Doc. 15 at 23–24).  Petitioner also states that his post-conviction counsel introduced Mr. Etheridge's attorney time records at the evidentiary hearing, which showed that Etheridge met with Petitioner for two hours on April 10, 1998, and two hours on November 11, 1998 (*id.* at 24).  Petitioner reasserts his argument that if Mr. Etheridge had spent more time consulting with Petitioner, he would have seen that Petitioner's demeanor was affected by the administration of anti-psychotic drugs, and he would

have requested a competency hearing (*id.* at 25).  Petitioner does not address Respondent's argument that he failed to include this claim in his appeal of the trial court's denial of his Rule 3.850 motion.

To the extent Petitioner claims that Mr. Etheridge failed to adequately consult with him to determine his competency to stand trial, that claim was addressed in the court's consideration of Ground Six *supra*.  To the extent Petitioner claims that Mr. Etheridge failed to adequately consult with him to prepare a defense and prepare him for his trial testimony, the undersigned concludes that Petitioner failed to exhaust this claim in the state courts.  In his post-conviction motion, Petitioner stated the following grounds for relief:

> Ground No. 1:        Ineffective Assistance of Counsel:
>     (A)    Failure to Investigate and Prepare for Trial:
>         (1)    Failed to investigate sources of evidence of mental health and prepare a potential defense of temporary insanity.
>         (2)    Failed to investigate and establish affirmative defense of voluntary intoxication to specific intent crime which would have supported the defense of temporary insanity.
>         (3)    Where defendant was being involuntarily medicated with the psychotropic drugs 'Thorazine; Haldol; Prozac; Depakote; Mellaril; Vistiaril; Flexeril and Cogentin.'  Did he suffer diminished capacity to aid his counsel in his defense?
>     (B)    Trial Error:
>         (4)    Counsel was ineffective for failure to argue in closing argument 'excusable homicide' to relate the applicable law to the facts of the case.

(Doc. 11, Ex. K at 74–75).  Furthermore, Petitioner's post-conviction counsel did not amend the Rule 3.850 motion to add this claim during the evidentiary hearings, as he did with the previous claim concerning counsel's failure to investigate Kenny Royster as a witness.  Although Petitioner argues that his Rule 3.850 motion was effectively amended to add this claim by virtue of the fact that evidence concerning the frequency and duration of Mr. Etheridge's visits to the jail was adduced at the evidentiary hearings, the record shows that this evidence was submitted in support of Petitioner's claim that Mr. Etheridge failed to investigate Petitioner's mental status with regard to his competency to proceed to trial.  The presentation of this evidence was not sufficient to place the trial court on notice that Petitioner was presenting an independent claim of ineffective assistance of

counsel based upon counsel's failure to adequately consult with him to prepare a defense and prepare him for his trial testimony.

Additionally, even if Petitioner effectively amended his Rule 3.850 motion by adducing evidence on this claim at the evidentiary hearing, Petitioner's post-conviction counsel did not include the issue of counsel's failure to consult to prepare for trial in his brief appealing the state court's 3.850 decision.  Petitioner was not appealing from a summary denial of his Rule 3.850 motion without an evidentiary hearing; therefore, he was required to file a brief raising his specific Rule 3.850 claims.  Indeed, a brief is not required on appeal from summary denial of a Rule 3.850 motion without an evidentiary hearing; however, briefs are required when the appeal is from denial of a Rule 3.850 motion after an evidentiary hearing.   *See* Fla. R. App. P. 9.141(b)(2)(C), 9.141(b)(3)(C).  A failure to appeal a specific issue after denial by the Rule 3.850 trial court is a procedural default.  *See* Cortes v. Gladish, 216 Fed. Appx. 897, 899–900 (11th Cir. 2007) (not selected for publication in the Federal Reporter, No. 05-16399) ("In contrast, had Cortes received an evidentiary hearing, his failure to address issues in his appellate brief would constitute a waiver."); Matthews v. McNeil, No. 4:07cv356-RH-WCS, 2008 WL 4925643 at *4 (N.D. Fla. Nov. 14, 2008) (petitioner there had a Rule 3.850 evidentiary hearing, filed a brief on appeal, but failed to address grounds one, two and three, and therefore procedurally defaulted as to those claims).

In the instant case, Petitioner argues that his claim concerning counsel's failure to consult with him was litigated at one or both of the evidentiary hearing on his Rule 3.850 motion.  The record shows that Petitioner's counsel, however, raised the following issues on appeal of the Rule 3.850 decision:

I.    THE TRIAL COURT ERRED IN FINDING THAT COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO REQUEST A PRETRIAL PSYCHOLOGICAL EXAMINATION OF THE DEFENDANT AND/OR FOR FAILING TO INVESTIGATE THE DEFENDANT'S MENTAL STATUS, IN RELATION TO MR. WARE'S DIMINISHED CAPACITY

II.   TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE THE AFFIRMATIVE DEFENSE OF VOLUNTARY INTOXICATION, AND THE TRIAL COURT'S ORDER DENYING HIS RELIEF ON THIS CLAIM WAS IN ERROR.

(Doc. 11, Ex. M).  Neither of these issues related to trial counsel's failure to adequately consult with Petitioner to prepare a defense and prepare him for his trial testimony.  Therefore, assuming arguendo that Petitioner fairly presented his failure to consult claim to the trial court in the Rule 3.850 proceedings, the undersigned concludes that Petitioner failed to exhaust this claim in the state courts.  Furthermore, Petitioner is barred by state procedural rules from returning to state court and presenting this claim in a second or successive Rule 3.850 motion.  *See* Fla. R. Crim. P. 3.850(f); *see also* Frazier v. State, 898 So. 2d 1183, 1183–84 (Fla. 3d DCA 2005) (barring as successive claims that could have and should have been made in previous post-conviction motion); Washington v. State, 876 So. 2d 1233, 1234 (Fla. 5th DCA 2004) (same).  Therefore, Petitioner's claim that Mr. Etheridge was ineffective for failing to adequately consult with him and prepare his trial testimony is procedurally barred from federal review.  Petitioner has not shown cause and prejudice for his failure to exhaust, or that he qualifies under the miscarriage of justice exception to the procedural bar.  Therefore, he is not entitled to federal review of this claim.

Accordingly, it is **ORDERED**:

The clerk of court is directed to change the docket to reflect that Walter A. McNeil is substituted for James R. McDonough as Respondent.

And it is respectfully **RECOMMENDED**:

That the petition for writ of habeas corpus (Doc. 1) be **DENIED** with prejudice.

At Pensacola, Florida, this 24th day of February 2009.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**